I want to just talk briefly about the summary judgment standard. As you know, summary judgment is not the time for resolving fact disputes, determining credibility, or weighing the evidence. It is an opportunity to consider Ms. Pedersen's evidence in the most favorable light, to draw all justifiable inferences in her favor. When her evidence contradicts the employer's evidence, then her evidence needs to be believed. And the question ultimately is whether under this Minnesota Whistleblower Act case there is work for a jury to do. And we respectfully submit there is work for a jury to do here. There are two disputes of fact that the district court resolved against Ms. Pedersen. The first is whether or not the employer already knew about the conduct that she reported. And the second is whether or not the conduct she reported implicated a violation of law or of rule adopted pursuant to law or of professional, ethical, clinical standards. And I'd like to talk about each of those. The Minnesota Whistleblower. Pardon me. Just a second. What is your contention that rule of law or ethics or some standard was violated by what happened here? We contend that this is conduct, first of all, I mean it's conduct about mishandling blood samples. And packaging and transporting blood samples is not just left to the discretion of the guys in the mail room. It is regulated by the Department of Transportation and the staff at the employer were trained using a Department of Transportation DVD on how to transport blood samples. And the reason for all of this is that the blood samples needed to stay below a temperature of 46 degrees in order for the lab to be able to return valid results. So the first violation is mispackaging those blood samples so that their integrity might be compromised. Additionally, the violations that we're concerned about are 42 CFR. But the mispackaging. Yes. The violation of mispackaging is because it didn't follow the manufacturer's requirements? Correct. It didn't follow the lab's requirement in this case. The lab, I guess. Yeah. The lab's directions. So, and as a result, did not return an accurate result. In addition, dialysis is heavily regulated by the Centers for Medicare and Medicaid Services because it is funded by Medicare. And as a result, there are CFR provisions that apply. We maintain one is 42 CFR 494.80, another is 494.90. And we maintain that. These speak to requiring a facility to individually assess a patient's needs and to ensure that they are receiving dialysis treatment based on their specific individual needs. There's a lot of testimony in the record that dialysis is not a one-size-fits-all proposition. That it depends on medications being administered depending on what a patient's blood work shows. There's also testimony in the record that a very small difference can make a big difference in terms of patient health. That it can cause a heart attack. That it can cause death. And that's one of the reasons why Ms. Peterson was concerned when blood samples at her employer were not properly packaged. In addition to the CFR, there's also, actually there's another CFR provision, 494.60, which speaks to the operation of dialysis equipment. Dialysis equipment needs to be operated in accordance with the manufacturer's requirements. And that means having accurate lab results so that the medication can be properly titrated. If the medication isn't, if the lab results aren't accurate, the medication might be off. If the medication is off, the equipment can't be properly operated. And finally, there are, in addition to the handling of the blood, there's a second layer of whistleblowing that's going on here that has to do with communication. When Ms. Peterson reported the blood problem to her supervisor, the clinic manager, and to the area manager, the area manager told her, don't tell the doctor. We don't tell the doctors. We're going to handle this in the clinic. And she reasonably took that to mean that the medical director was not going to be informed. The patient's doctors were not going to be informed. Well, in fact, we have testimony in the record that the patient's doctors would want to know about blood not being properly handled. And the communication issue that is involved in suppressing her telling the doctor violates additional regulations. It violates the end-stage renal dialysis core survey process, which is the CMS directions on how facilities are evaluated. It requires a culture of safety that encourages open communication where there's no retaliation or fear of retribution. It also implicates the Minnesota Nurse Practice Act, which is not necessarily something that the facility is subject to, but the two individuals, the clinic manager and the area manager, are both nurses. And the Nurse Practice Act prohibits any nursing practice that may create an unnecessary danger to a patient's life, health, or safety. You don't need to have an actual injury, just an unnecessary danger. It also prohibits knowingly providing false or misleading information that is directly related to the care of the patient. And so it is our position that both not telling the doctors about the blood samples and prohibiting the staff from telling the doctors about the blood samples is directly related to the care of the patient. We have testimony from Dr. Hunt that this is information she would want to know. And so that, we maintain, also violates, potentially violates, the Minnesota Nurse Practice Act. In addition, the district court also concluded that the employer already knew everything, and so there was no whistle left to blow. And I would respectfully submit that that if the employer knew, it's on what the employee knew, whether the real reason that she came forward was to report a violation or to protect patient safety. And here we have plenty of evidence that that was the case. Obviously, at some point, the court does have to declare the whistle is blown. But in this case, there were several reports over a very short period of days, and all of them were attempts to make sure that the doctors knew, the medical director knew, and the company knew. The mere fact that there's been a prior report or that somebody within the employer knows about a potential violation isn't the end of the inquiry. There's a case we cite in our brief called Wood v. Satcom. The same employee reported violations three times, four times, actually, in the space of a few weeks. And the first three of them were considered to be good faith reports protected by the act. They were reported to different people. There are two scenarios that we would submit apply to whether or not the employer knows here. The first is the conduct is protected by the act if the first report goes nowhere. And that's what we're saying happened here. Peterson's evidence suggests that she reported to her clinic manager who said it's taken care of. She reported to the area manager who said, we don't tell the doctors. And at that point, it was clear that the information was not going to go any further. It was not going to go to the doctors. It was not going to go to the patients or the medical directors. And when that happens, it's appropriate, the Minnesota Supreme Court has recognized, for an employee to go outside their chain of command. And in fact, that's exactly what Ms. Peterson did. The very next morning, she called the employee access line, and she reported both the mishandling of the report. She had been told by the area manager not to tell the doctors. So that is a report that's protected within the act we submit. Also, it is permissible, a second or subsequent report is protected if there's a new violation. And again, the district court here really focused only on the blood and not on the communication and said, well, because they knew about the blood, there was no whistle left to blow. In fact, what Ms. Peterson was reporting was not just the blood, but a new violation. The fact that her supervisor had told her, you can't tell the doctors, don't tell the doctors. And so that was the substance or part of the substance of her second and subsequent reports. And both of those are from Kidwell versus Sybaritic, the Court of Appeals opinion and also the Minnesota Supreme Court of Opinion. So Peterson first went to her chain of command, and then she went, she reported in a patient care conference, and then she went outside of her chain of command. And from this evidence, a jury could find both that the conduct she was reporting implicated a law or a rule of professional clinical ethical standard, and also could find that the employer did not already know about it, such that there was no music left in that whistle. I see my time is up, so unless the court has further questions, I'd be happy to save the rest for rebuttal. Okay. Thank you. Thank you, Your Honor. Ian Rebuttal. You have to help me here. Merkavich? Merkinich. Merkinich. My father was actually a high school classmate of Judge Bright. Oh, okay. So it's an iron range name. May it please the court, counsel, my name is Marco Merkinich, and I'm here today on behalf of Biomedical Applications, Inc. of Minnesota, that sometimes operates under the trade name Fresenius. This is an employment case that involves the routine application of well-settled Minnesota whistleblowing law, as interpreted both by the Minnesota Supreme Court, this court, and the trial courts throughout Minnesota, to a set of undisputed facts. Judge Kyle correctly decided this case on summary judgment at the close of discovery, dismissing the case as a matter of law, because Plaintiff Lisa Peterson did not establish that she reported matters not already well-known, investigated, and addressed by the employer, that she had a public purpose, or the purpose of exposing illegality in making her alleged communications at the time she did, or that the action she reported, if proven, violated any identified legal standard. In fact, had Judge Kyle chosen to do so, the undisputed facts also showed that there was no adverse action against Ms. Peterson attributable to the alleged whistleblowing activity, and in fact, that her own decisions resulted in her decision not to work any longer at Fresenius. Those issues of adverse action and causation are not part of this appeal right now, but they're within the reach of the court should they choose to reach it. As a matter of law, the decision made by Judge Kyle should be affirmed. The undisputed facts are clear, and it's important, I think, to keep them in order. Ms. Peterson was working as a dialysis nurse in the Shakopee Clinic as of April 2012. She had performance issues, and those were undisputed. A patient had complained because she called her at home and asked her to bake her a pie and some cookies. A patient had complained that she had slapped and abused him, that she had used the wrong thing. Those aren't really what this case is about, but they were part of the background of where Ms. Peterson was. There are seven key facts about the timeline that matters as to the At that time, on the night of April 11th, blood samples had been drawn during the day and they were packaged in a Spectra package to be sent to the Spectra lab. Spectra has two different kinds of package. One goes to one address, one goes to another address. One contains mostly water, one contains mostly blood. The packages in question were put into the wrong box and they were not picked up by the UPS man or the Federal Express man or whoever the overnight delivery person was. So that's the night of April 11th. The morning of April 12th, this is the second fact, at about 5.30 in the morning, one of the patient care technicians finds that last night's package hasn't been mailed. This is not Ms. Peterson. The person who finds it, examines it, finds that it's still cold because the box had the right number of ice packages in it for that particular box. She sees that it's cold. She puts it into the refrigerator. It's still cool. There's no evidence that the blood was ever warm. When she sends it into the refrigerator, the clinic also draws blood on April 12th. That evening, the blood's packaged and it's sent out to the right address in the right in this facility. She doesn't learn from Ms. Peterson. In fact, Ms. Peterson never mentions this to anyone until four days later. So this is six days old news before Ms. Peterson even mentions it. So Ms. Kinzel learns and says, what should we do? And she says, we'll wait to see what the lab results are. Because if the lab results are skewed, then we know we have a problem. And if the lab results are within the normal range for the patients, we can presume we do not have a problem. And we can avoid drawing more blood from patients because it's an invasive procedure. The goal is to minimize that. She also directs Samantha Ince, the manager of the clinic in Shakopee, to contact the lab, to arrange for training for the staff so they understand how to do this correctly. And also to find out what to do about the samples. And she calls the wrong lab. She calls the Alina Hospital lab initially and learns that blood can be out 48 to 72 hours if it's chilled without a problem. On April 14th, this is the fourth fact, the next day, and this is undisputed, the lab results come back. All of the blood samples drawn on April 11th, the date with the packaging issue, are within the normal range for the patients involved. There's no problem. There's one blood sample drawn on April 12th, the next day, that is out of range. So this was properly packaged, properly cared for, no problem with the packaging, it's just a result out of range. So that's what we know on April 14th. The fifth fact is on April 17th, three days later, Ms. Ince tells Ms. Peterson that she is being transferred from the Shakopee Clinic because of her performance problems. Because she is going to be working with the supervisor with whom she's closer and who's more experienced as a supervisor than Ms. Ince. The sixth fact is, after that meeting, there is a patient care meeting that involves Ms. Peterson and Dr. Hunt. Now, the way the dialysis clinics work, the doctors are not employed by the clinic, and the clinics will serve as patients of more than one doctor. So Dr. Hunt is not the medical director, who is another physician, but she is a doctor whose patients are seen at the clinic. During this meeting, Ms. Peterson tells Dr. Hunt that in fact this incident happened with the blood supply on the 11th and the 12th. And Dr. Hunt orders, not that the 11th test be redone, Dr. Hunt says the test result that of range from April 12th. Let's redo that test to see if it's right. But she does nothing about April 11th, and she does nothing to alert the patients from April 11th that there's anything out of order with their blood sample. Again, that's an undisputed fact. After that, Ms. Peterson then reports, what follows from that is they retested the blood People on dialysis will often have spikes if their body's doing things that the dialysis doesn't catch, and it may be the treatment regime or the drug regime they're on is no longer working. So basically, they retest the person whose blood result was abnormal, but Dr. Hunt does not order any retesting of the samples that were drawn on April 11th. Nor does she direct that any information be shared with the patients from April 11th. Afterwards, Ms. Peterson then mentions the same facts on the helpline and to Ms. Ince and to Ms. Kinzel, both of whom are already well aware of it, and tell her that, hey look, this has already been taken care of. We looked at it, it was properly cooled, we sent it, we got the test results, they showed no problems, no abnormalities. So Ms. Peterson then goes out on an FMLA leave, because at the same time, the investigation about the patient abuse, and she was also impersonating another manager in some telephone messages and written communications, again, these are all undisputed facts. And she goes out on an FMLA leave, and those issues aren't addressed until she returns from that leave. But the key fact is, or the key facts are, April 12th is when the issue was detected. April 17th is when Ms. Peterson first mentioned it to anybody. After it had been reported and dealt with by at least five or six people. When she reported it to Dr. Hunt, Dr. Hunt said, ordered no new tests, no new events as it related to the April 11th patients. And in fact, this testimony about what was said regarding sharing information with the doctor, Ms. Kinzel and Ms. Peterson have a disagreement. Ms. Kinzel's account was, you can't criticize the PCT in front of the doctor. You should tell us if there's a problem with the PCT. Ms. Peterson says otherwise. And we don't need to get into that though, because that only happens on April 17th. Let's get to what I think is maybe your strongest point. The district court said that there was no evidence, no real violation of any legal, ethical, or clinical standards. Right. And that was the basis, one of the basis, primary basis. Now I've heard today and in the briefs that the plaintiff says it violated the lab's directions, their standards, some of the CFRs, and the not telling the doctor. So what's your response to whether these are qualified violations? Your Honor, they are not. Basically, there is no established law, there is no established standard, there is no established anything, as Judge Kyle found, that creates a standard for dealing with blood in this way. And there's no standard that was violated as to which she has any facts to show or claim or allege a violation. Ms. Peterson needs to identify one of these standards. And if you look at them, she's pointed to a bunch of general things about Medicare that have nothing to do with the There's no standard that's been pointed to, even, that you could look at and say, show me where it reads this way. The law is clear that showing a violation of internal rules or policies is not a violation of law or an ethical standard. But if How do you react and how do you respond to her good face reporting of a violation or a suspected violation? Well, Your Honor, there are two Is the record so clear that no one could ever determine that she acted other than in bad face? Your Honor, it has to be good faith. It has to be, first of all, you have to blow the whistle. Judge Kyle found she didn't blow the whistle because it was known. So it's not a good faith report. Second, it was done, we submit, on the record, to protect herself against job problems, not to expose an illegality, because it happened six days after it happened and it was already addressed. And third, it has to report facts that, if proven to be true, establish a violation of law. So it's not enough, and this is well established in the case law, it's A violation of law or something would, if it weren't reported, would put patients at risk? It's, Your Honor, we submit it has to be a violation of an established law, legal standard or an ethical standard. Is that what the Minnesota courts say? Yes, we believe that's exactly what they say, Your Honor. In fact, if you look at the Opes case and the Kidwell case, the Hitchcock case that, in fact, Your Honor wrote, goes through and talks about the facts, if true, must violate the law and not simply violate some sort of internal standard or best practice. And it has to be a violation of the law. We submit here that what she complained about didn't violate any of those things. Because if you look at the undisputed facts as to what happened, even if you take what she reported, there wasn't a violation of law there. So what does she claim happened? She claims the blood was packed in the wrong package, but she can't point to anything other than that as a problem. And that issue was addressed. So what is the legal standard that's violated by putting the blood in a package? And frankly, there's no showing that it is absolutely the wrong package. There's a test, the two packages the testimony was, one goes to one address, one goes to another address. One is intended primarily for water. They're both cooled. And this one had the right amount of ice in it. And it was not an event she this particular case, and if you look at where is the legal standard that's been violated, there isn't one. They pointed to the Nursing Act. That doesn't have a standard for the packaging of blood. They point to the issue involving the Medicare regulations. That doesn't have a standard involving blood. Dr. Hunt, the physician, did not report any of this to patients and did not direct that that be done. There's no legal standard out there that requires that a patient be advised of the way in which their blood is shipped from a doctor's office or a medical facility to a laboratory. There just isn't. The fact that the manufacturer has regulations and best practices and guidelines, those are not legal standards. Those are simply recommendations. And that's what Judge Kyle found. He looked at all of the things that were identified by the plaintiff as potential sources of legal standard, and one by one he went through and explained why it is not, in fact, a legal standard that was violated. He also pointed out, and I think these two grounds stand together, that there was no whistleblown here. There was nothing that Ms. Peterson brought forward that was not already well known to the company. This is like the Opes v. Micron case where the court said, you're talking about an issue that was dealt with repeatedly, the company knew about, had an approach to. And as a matter of law, this is not a protected act. There's no reasonable jury here that could find illegal retaliation because of whistleblowing. Instead of whistleblowing, what we see is performance and behavior problems, a packaging error that was addressed and fixed without harm to any patient whatsoever. It was known and fixed before the plaintiff's initial report. There's no whistleblowing that took place because of that. It was not for a public person. It was to deflect attention from her performance problems, and there's no legal violation identified. We respectfully request that the judgment entered by the trial court be affirmed. Thank you. Thank you. Mr. Chiano, you have 440. Thank you, Your Honor. Unlike OPST, which counsel has just mentioned, that was a case where the employee reported repeatedly and that the employee wanted the employer's customer to know that there were problems with these windshield wiper modules. And yet at the time the employee reported, he knew that the customer already knew. And so that's why it was a problem with the employee's good faith. That's not the situation that we are facing here. At the time she reported, Ms. Peterson testifies, she didn't know what the employer knew specifically. She didn't know what the lab results said. She was sitting in a care conference with the doctor and with a clinic manager, and they noticed that there were a couple of... Chiano, I thought she said, the first time she reported to somebody, again, a supervisor, somebody said, you know, we already know about that, we've taken care of it. That's in the care conference. Her immediate supervisor, the clinic manager, is in the conference with her and the doctor, and the subject comes up because they're looking at lab reports and some of them are skewed. And Ms. Peterson thinks, you know, wow, that could be from the box that we had that was left out. Could that be the reason? And so that was kind of what prompted her to raise it at that particular point as opposed to earlier. And then her supervisor, the clinic manager, says, well, we're taking care of it. We've got the lab results back and we're done. The problem, and by the way, many of the facts that counsel has mentioned and described as undisputed are in fact disputed. One of the things we say is disputed is what exactly Spectre was told. We maintain they were never told that anything was wrong, that blood was ever left out in the wrong box without enough ice pack, without enough insulation. Instead what happened was the clinic manager called a different lab, asked a hypothetical question about how long properly packed blood could be left out, then called Spectre to arrange a training. So Spectre never got the word that anything was wrong with this particular shipment. They never had an opportunity to control for the variables that this blood might have exceeded 46 degrees. And as a result, it's great that the lab results came back and appeared to be within the range, but they were not reliable. And Ms. Peterson had a good faith reason for having questions about whether they were reliable and whether she could permissibly titrate medications based on those results. It also gave her reason to believe that the doctors for the patients ought to be informed that this had happened to their blood samples. She did not know at the time she was in the care conference that the particular sample that they were looking at turned out to be a sample from a different day because the two days were packaged together and sent off to the lab. But the Minnesota Whistleblower Act protects her even if she's wrong on the facts. She had a good faith reason for suspecting something was wrong with some of that blood, and that's what she reported. And as long as that report would potentially violate the law or rules passed pursuant to law, and in this case, I would submit that the CMS guidelines, Specter's guidelines, these are all rules that are passed pursuant to law in a regulatory regime. This is not a purely internal policy. This is designed to protect patient safety and ensure the integrity of specimens. So for what it's worth, I think that that has been adequately established. We also say that the differences in packages are much more than just having the wrong label. They were different packages, and Specter specifically instructed not to use the one that was used for shipping blood. That's in the appendix. I believe it's around page 400 where Specter has its instructions to people. So basically, the employer is relying on its own version of the facts today as it did in bringing its motion for summary judgment. We would encourage you to look at Ms. Pierce's version of the facts. There are more than enough facts here to determine that she reported this because she believed it was a violation of law and clinical standards and rules, and she reported it because she was concerned about patient safety. That's what's necessary for good faith. She also did not know at the time she reported it that the employer knew about it and had already received lab results back, and when she did report it, that was when she had a second violation, which was that she was told not to tell the doctors, and that was the subject of her future reports. Thank you, Your Honors. Thank you very much. We appreciate your arguments both in the briefs and the oral arguments. Well done, and we'll be back to you as soon as we can. Thank you.